UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JACQUELINE W., | |
| Plaintiff, | |
| v. | Case No. 19 C 3553 |
| ANDREW M. SAUL, Commissioner of Social Security, | Magistrate Judge Sunil R. Harjani |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jacqueline W.[1] seeks judicial review of the final decision of the Commissioner of Social Security finding her ineligible for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, Jacqueline's motion [11] is granted in part and denied in part, the Commissioner's motion [23] is denied, and the ALJ's decision is reversed and this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

## BACKGROUND

Throughout the years prior to claiming disability, Jacqueline worked several jobs, including as a switchboard operator and secretary at a hospital. (R. 42-43). She later worked as a medical receptionist at a doctor's office and eventually held part time jobs at a restaurant, department store, and nursing home. *Id.* at 48-49. Jacqueline was performing part time work as a cashier at a department store in 2015 when she began experiencing pain

---

[1] Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by her first name and the first initial of her last name or alternatively, by first name.

in her feet. *Id.* at 49, 51.  Jacqueline's doctor diagnosed her with plantar fasciitis, and Jacqueline stopped working. *Id.*  In addition to plantar fasciitis, Jacqueline has been diagnosed with, among other things, neuropathy, pneumonia, anxiety, depression, restless leg syndrome, subacute combined degeneration of spinal cord, right rotator cuff tear, and irritable bowel syndrome. *Id.* at 715, 764-65, 893, 1212, 1439.  In September 2017, Jacqueline was hospitalized after presenting chest pressure, shortness of breath, abdominal and increased leg edema, and a recent weight gain. *Id.* at 1325-31.  Jacqueline was diagnosed with hypoxic respiratory failure and pneumonia. *Id.* at 1333.  Her hypoxemia has been persistent, and Jacqueline has required daily supplemental oxygen since the September 2017 hospitalization. *Id.* at 1344.

In March 2016, Jacqueline protectively filed a Title II application for a period of disability and disability insurance benefits, alleging that she became disabled beginning August 1, 2015. (R. 102, 231).  Jacqueline's claim was initially denied on July 14, 2016, and upon reconsideration on October 28, 2016. *Id.* at 102, 117.  Upon Jacqueline's written request for a hearing, she appeared and testified at a video hearing held on February 15, 2018, before ALJ Deborah Giesen. *Id.* at 35-90.  At the hearing, the ALJ heard testimony from Jacqueline and a vocational expert, Bonnie Martindale, and Jacqueline's friend, Carol DeMoss. *Id.* at 74, 76.

On May 15, 2018, the ALJ issued a partially favorable decision, finding Jacqueline disabled as of September 20, 2017, but not before. (R. 14-27).  The opinion followed the required five-step evaluation process. 20 C.F.R. § 404.1520.  At step one, the ALJ found that Jacqueline had not engaged in substantial gainful activity since August 1, 2015, the alleged onset date. *Id.* at 16.  At step two, the ALJ found that Jacqueline had the severe

impairments of obesity, subacute combined degeneration of the spinal cord, polyneuropathy of the bilateral lower extremities, sleep apnea, status-post right shoulder rotator cuff repair, spondylosis of the lumbar and cervical spine, and degenerative disc disease of the thoracic spine. *Id*. at 16-18. At step three, the ALJ determined that, Jacqueline did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). *Id.* at 18-20.

The ALJ then concluded that prior to September 20, 2017, Jacqueline retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), except:

> The claimant could not work around unprotected heights, open flames, or dangerous moving machinery. She could not climb ladders, ropes, or scaffolds. The claimant could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She could occasionally reach overhead. The claimant could not tolerate concentrated exposure to extreme humidity or vibration. She could work in an environment with moderate noise levels, which is approximately the level of noise in a normal office setting, pursuant to the description in the *Dictionary of Occupational Titles (DOT)*.

(R. 20). Based on this RFC, the ALJ determined at step four that, prior to September 20, 2017, Jacqueline could perform her past relevant work as a patient registration clerk, switchboard operator, office clerk, and staffing clerk. *Id.* at 25-26. At step five, the ALJ accordingly found that, prior to September 20, 2017, Jacqueline was not disabled. *Id*. at 27.[2] The Appeals Council denied Jacqueline's request for review on March 29, 2019,

---

[2] After September 20, 2017, the ALJ found that Jacqueline retained the RFC to perform sedentary work with additional functional limitations. (R. 24-25). The ALJ consequently determined that beginning on September 20, 2017, Jacqueline could not perform her past relevant work. *Id.* at 26. Because the ALJ found that Jacqueline was closely approaching retirement age as of September

3

leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-4; *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018).

## DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v.*

---

20, 2017, and because Jacqueline does not have work skills transferable to other occupations within her post September 20, 2017 RFC, the ALJ determined that no jobs exist in significant numbers in the national economy that Jacqueline can perform. *Id.* at 26-27. The ALJ therefore found Jacqueline disabled as of September 20, 2017. *Id.* at 27.

4

*Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Although this standard is generous, it is not entirely uncritical." *Steele*, 290 F.3d at 940. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Id.*

The ALJ found Jacqueline not disabled prior to September 20, 2017 at step five of the sequential analysis because she retains the RFC to perform her past relevant work. Jacqueline argues that the ALJ improperly discounted the opinion of her treating physician, Dr. Wargo. The Court agrees.[3] Accordingly, for the reasons discussed below, the ALJ's decision must be reversed.

Dr. Mark Wargo completed a two-page physical RFC assessment on August 3, 2017. (*See* R. 1226-27). In his assessment, Dr. Wargo checked a box indicating that Jacqueline could frequently lift and/or carry 10 pounds while also checking a box stating that Jacqueline could only occasionally lift and/or carry less than 10 pounds. *Id.* at 1226. Dr. Wargo further opined, through the checking of boxes on the RFC questionnaire, that Jacqueline could stand and/or walk less than about 6 hours in a workday, that she could sit for less than about 6 hours in a workday, and that she had limited push and/or pull abilities. Dr. Wargo further checked the "Never" box with respect to Jacqueline's ability to climb, balance, stoop, kneel, crouch and crawl. *Id.* at 1226-27. While Dr. Wargo believed Jacqueline had unlimited speaking and seeing abilities, Dr. Wargo stated that Jaqueline was limited in her ability to reach, handle, finger, feel, and hear. *Id.* Next to those checked

---

[3] Because the Court remands on this basis, the Court does not address Jacqueline's other arguments.

5

boxes, Dr. Wargo wrote "wears glasses" and "wears hearing aids." *Id.* at 1227. In terms of environmental restrictions, Dr. Wargo stated that Jacqueline was "unable to work above ground well due to neuropathy" and "unable to operate machinery." *Id.* Dr. Wargo described the ways in which Jacqueline's reaching, handling, fingering, feeling, and hearing activities are limited as follows: "The patient has been diagnosed with subacute combined degeneration of the spinal cord and sensory neuropathy by neurology which limits the [ ] activities." *Id.* In support of his findings, Dr. Wargo stated that "The patient has been followed by Neurology. The conclusions were based on conversation with the patient as well as observations and conclusions drawn from extrapolations based on her symptoms." *Id.*

In weighing Dr. Wargo's opinion, the ALJ stated that she "affords limited weight to the August 2017 opinion[.]" (R. 23). The ALJ then recited some of Dr. Wargo's findings. *Id.* The ALJ found Dr. Wargo's opinion "internally inconsistent regarding the claimant's abilities in lifting and carrying." *Id.* at 23-24. The ALJ also took issue with Dr. Wargo's finding that Jacqueline could not stoop, in light of Jacqueline's testimony that she is able to get into a car and drive short distances, as well Jacqueline having "no difficulties sitting and rising form a chair on examination" in a June 2016 consultative examination. *Id.* at 24 (citing *id.* at 548). The ALJ further found that there was no objective support for limitations in reaching, handling, and fingering, elaborating that "[t]he claimant did not have an EMG, and she recovered well after her right shoulder surgery. In fact, post-surgery, she exhibited a full range of motion of the right shoulder, without pain." *Id.* at 24.

The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and

6

is not inconsistent with the other substantial evidence in [the] record" 20 C.F.R. § 404.1527(c)(2); *Kaminski v. Berryhill*, 894 F.3d 870, 874 n.1 (7th Cir. 2018) (for claims filed before March 27, 2017, an ALJ "should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record."). An ALJ must "offer good reasons for discounting a treating physician's opinion." *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Walker v. Berryhill,* 900 F.3d 479, 485 (7th Cir. 2018). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *see* 20 C.F.R. § 404.1527(c).

**A.     The ALJ Did Not Provide Good Reasons for Discounting Dr. Wargo's Opinion**

In this case, the ALJ's weighing of Dr. Wargo's opinion is not supported by substantial evidence. To begin, at least two of the three reasons the ALJ provided for discounting Dr. Wargo's opinion are not good reasons. The ALJ gave limited weight to Dr. Wargo's opinion, in part, because of Dr. Wargo's opinion that Jacqueline could never stoop as part of her job. The ALJ reasoned that Jacqueline could get into her car to drive short distances, and she was able to sit and rise from a chair without difficulty in a June 2016 consultative examination. (R. 24). Although it may seem like common sense that a person able to get into a car can stoop, "[c]ommon sense can mislead; lay intuitions about medical phenomena are often wrong." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). The ALJ, moreover, did not develop the record with respect to the specifics of

7

Jacqueline's vehicle, such as the height of the vehicle, nor Jacqueline's methods for getting into the vehicle. In addition, the ALJ ignored Jacqueline's testimony and the medical records reflecting that sitting and driving were painful for Jacqueline. (*See, e.g.*, R. 64-65, 575-76, 590-91). For instance, in a physical therapy record from June 2016, Jacqueline reported that pain restricted her to traveling only for short necessary journeys taking less than 30 minutes, and that pain prevented her from sitting more than 30 minutes. *Id.* at 779-80. After conducting an examination, the physical therapist assessed Jacqueline as presenting with "decreased [Range of Motion] of lumbar spine, pain and tightness in lumbar spine of vertebrae and muscles, and decreased strength of left lower extremity resulting in functional limitations with sitting, walking, standing[.]" *Id.* at 781. From the Court's review, the ALJ did not discuss this physical therapy record, nor numerous other physical therapy records in Jacqueline's medical file recording serious limitations in Jacqueline's physical capabilities during the relevant time period that could have supported Dr. Wargo's opinion that Jacqueline should never stoop at work. In short, the ALJ failed to build the requisite accurate and logical bridge connecting Jacqueline's ability to (with pain and stiffness) get into her car to drive short distances to the ALJ's conclusion that Dr. Wargo's stooping decision was inconsistent with the record.

More problematic, however, is the ALJ's misstatement of evidence regarding Jacqueline's June 2016 consultative examination. The ALJ claimed that Jacqueline "had no difficulties sitting and rising from a chair on examination." (R. 24). Consultative examiner Afiz Taiwo actually noted in June 2016 that "[t]he claimant was able to get on and off the exam table and [was] getting up from the chair *with* difficulty." *Id.* at 548 (emphasis added). In the appended "Degrees of Difficulty in Performance" chart, Dr.

8

Taiwo checked the box for "Moderate Difficulty" with respect to squatting and rising and getting on/off exam table. *Id.* at 550. The ALJ's stooping articulation is, therefore, based on an inaccurate summary of the consultative examination, not "substantial evidence in the record." *Gudgel*, 345 F.3d at 470.

The ALJ's claim that there was no objective support for Dr. Wargo's reaching, handling, and fingering opinion fares no better. The ALJ determined that "there is no objective support for limitations in reaching, handling, and fingering. The claimant did not have an EMG, and she recovered well after right shoulder surgery. In fact, post-surgery, she exhibited a full range of motion of the right shoulder, without pain." (R. 24). As an initial matter, this conclusion from the ALJ is confusing because in the paragraph directly preceding the ALJ's weighing of Dr. Wargo's opinion, the ALJ acknowledged that the state agency physicians "did not have the opportunity to review the updated medical records and the claimant's testimony, which support slightly greater limitations," including the records documenting Jacqueline's right shoulder arthroscopy for rotator cuff repair in 2017. *Id.* at 23. The ALJ then indicated that Jacqueline's shoulder history led the ALJ to limit the claimant to occasional overhead reaching. *Id.* Simply put, the ALJ limited Jacqueline to occasional overhead reaching due to Jacqueline's medical history with respect to her right shoulder. The ALJ's statement that there was no objective support for Dr. Wargo's consistent opinion that Jacqueline's ability to reach was limited is consequently puzzling, especially when the ALJ cited to a medical record in support of her decision to limit Jacqueline to occasional overhead reaching. *See id.* (citing *id.* at 893).

The ALJ also buttresses her rejection of Dr. Wargo's reaching, handling, and fingering opinion with the declaration that Jacqueline never got an EMG. (R. 24). Again,

9

the ALJ gets the record wrong. An Electromyography and Nerve Conduction Velocity test (EMG/NCV) was conducted on March 8, 2016. *See id.* at 614, 629-31. The attending neurologist who interpreted the scan stated that it was "an abnormal study," and that there was "electrophysiologic evidence for diffuse moderate to severe axonal motor neuropathy." *Id.* at 629. Even if Jacqueline had not gotten an EMG, there are several other medical records that appear to provide objective support for limitations in reaching, handling, or fingering, such as numerous physical therapy assessments, the MRI of her right shoulder from January 2017 showing "tendinosis of the supraspinatus infraspinatus tendon associated with a mild subacromial subdeltoid bursitis with a partial bursal sided tear of the leading edge of the supraspinatus tendon," Jacqueline's displaying diminished pinprick sensations in all extremities during a July 2016 examination, and a neurology consult in May 2016 assessing Jacqueline with upper extremity bradykinesia. *See, e.g.*, *id.* at 563, 586, 593, 772, 893, 1160-61, 1164-65. Despite acknowledging some of these findings elsewhere in her opinion, the ALJ makes the unfounded statement in weighing Dr. Wargo's opinion that there is "no objective support for limitations in reaching, handling, and fingering." *Id.* at 21, 24.

The fact that Jacqueline had a positive post-surgery follow up examination in June 2017 does not save the ALJ's reasoning in weighing Dr. Wargo's reaching, handling, and fingering opinion. While it is true that Jacqueline had a successful surgery and exhibited a full range of motion and no pain at a follow up examination in June 2017, following months of physical therapy, (*see* R. 1096, 1113, 1153), Jacqueline reported experiencing pain in her right shoulder again as soon as September 2017. *Id.* at 1440. More to the point, the ALJ's conclusion, at best, would mean that Jacqueline's reaching

10

had improved for a four month period beginning in June 2017. But the relevant time period being challenged by Jacqueline here is from August 2015 to September 2017. The ALJ's cherrypicked positive examination from June 2017 does not mean that Jacqueline could not have had limitations in reaching from August 2015 to June 2017. Additionally, Dr. Wargo explained that his reaching, handling, and fingering opinion was supported by Jacqueline's diagnoses of subacute combined degeneration of the spinal cord and sensory neuropathy. *Id.* at 1227. The ALJ's weighing of Dr. Wargo's reaching, handling, and fingering opinion, which focuses only on Jacqueline's rotator cuff surgery, ignores that support and omits discussion on how Jacqueline's spinal cord impairments and neuropathy could impact Jacqueline's ability to reach, handle, and finger. As a result, the ALJ's reaching, handling, and fingering reason for discounting Dr. Wargo's opinion, like the ALJ's stooping reason, does not constitute a good reason for giving less weight to Dr. Wargo's opinion.

In defending the ALJ's assessment of Dr. Wargo, the Commissioner neglects to address the ALJ's misstatements of record. Instead, the Commissioner primarily offers reasons *not relied upon* by the ALJ in weighing Dr. Wargo's opinion, such as Jacqueline's having babysat and prepared meals, in addition to examinations purportedly "showing a full range of motion in all joints, improved gait, and full motor strength."[4] Doc. [24] at 4.

---

[4] The Commissioner does discuss the ALJ's highlighting of Jacqueline's ability to get into her car, as well as the apparent internal inconsistency in finding that Jacqueline could frequently lift and/or carry 10 pounds while only occasionally being able to lift and/or carry less than 10 pounds. As discussed above, the Court takes issue with the ALJ's car finding in this case. As for the internal inconsistency argument, the Court agrees that an internal inconsistency may provide a good reason for discounting the opinion of a treating physician. However, the Court finds that two out of the ALJ's three explanations for giving less weight to Dr. Wargo's opinion in this care are invalid, and that those two reasons are sufficient grounds to find that the ALJ erred in weighing Dr. Wargo's opinion. The Court, therefore, need not delve into the internal inconsistency issue.

11

However, those were not the reasons provided by the ALJ for discounting Dr. Wargo's opinion, so the Court need not consider them; the Commissioner cannot defend the ALJ's decision on grounds that the ALJ did not herself embrace. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

The Commissioner suggests that the ALJ's decision to discount Dr. Wargo's opinion was supported by the opinions of the state agency physicians, Dr. Deborah Albright and Dr. Richard Blinsky. Doc. [24] 2-3. According to the Commissioner, Dr. Albright found in July 2016 that Jacqueline could perform a reduced range of light work, and that Dr. Blinsky agreed on reconsideration in October 2016. *Id.* Yet Dr. Albright found that Jacqueline could stand for six hours, signaling a light work RFC, while Dr. Blinsky found that Jacqueline could only stand for a total of 2 hours, which would disqualify Jacqueline from light work. (R. 98, 111). *See* SSR 83-10, 1983 WL 31251, at *6 ("[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."). Dr. Blinsky's October 2016 sedentary RFC therefore does not support the ALJ's pre-September 2017 RFC that Jacqueline could perform light work. Even if both state agency physicians' opinions matched the ALJ's RFC, there is a reason to not give their opinions superior weight. As the ALJ herself admitted, the state agency physicians did not have the opportunity to review later medical records, including those regarding Jacqueline's February 2017 shoulder surgery, which the ALJ stated supported "slightly greater" limitations. (R. 23). The state agency physicians further could not have reviewed the significant medical records pertaining to Jacqueline's lumbar medial branch blocks procedures in January 2017 and June 2017, the April 2017 MRI showing extensive degenerative changes at L4-5 and degenerative disc desiccation at L2-3, and her diagnoses

of spondylosis of the lumbar region, sacroiliac joint disease, and obstructive sleep apnea. (R. 891, 1219, 1220, 1307-08). *See Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (internal quotation marks and citations omitted) ("ALJs may not rely on outdated opinions of agency consultants if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion.").

**B.     The ALJ Failed to Minimally Address the Treating Physician Factors**

Even if the ALJ had given good reasons for not affording Dr. Wargo's opinion, controlling weight, the ALJ was still required to address the factors listed in 20 C.F.R. § 416.927(c) to determine what weight to give the opinions. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) ("ALJ should explicitly consider the details of the treatment relationship and provide reasons for the weight given to" treating physicians' opinions).

The ALJ gave Dr. Wargo's opinion limited weight but failed to minimally address several of the regulatory factors which tend to support Dr. Wargo's opinions. Specifically, the ALJ did not discuss the nature and extent of the treatment relationship, the frequency of examinations, the supportability of the decision, or whether Dr. Wargo had a relevant specialty. The ALJ did not acknowledge that Dr. Wargo was Jacqueline's primary care physician, specializing in family medicine. (R. 591, 961). And although it is not clear from the record exactly how long Dr. Wargo served as Jacqueline's primary care physician, the record indicates he began treating her as early as June 2014. *Id.* at 374. The ALJ did not recognize the duration of Dr. Wargo's treatment relationship with Jacqueline. The record demonstrates that Dr. Wargo saw Jacqueline on at least 8 occasions from August 1, 2015 to September 20, 2017. *Id.* at 581, 606-09, 619, 625, 631, 1199, 1437, 1441.[5] Dr. Wargo's

---

[5] A list of appointments submitted by Jacqueline accounts for 8 additional visits with Dr. Wargo. (*See* R. 375-77).

treatment of Jacqueline included conducting physical examinations, the ordering of labs, speaking with Jaqueline on the telephone, the review of labs and diagnostic imaging, the ordering and management of Jacqueline's prescriptions, and the referral of various specialists. *See, e.g.*, *id.* at 586, 591, 593-95, 606-09.

For instance, on January 2016, Dr. Wargo saw Jacqueline for a follow-up appointment subsequent to a rheumatology appointment he had referred. *Id.* at 631. Dr. Wargo reviewed recent labs and the rheumatologist's recommendation that Jacqueline obtain an EMG/NCV scan from a neurologist. *Id.* Dr. Wargo conducted a physical exam, ordered more labs, prescribed medicine, and referred Jacqueline to INI Neurology for evaluation and treatment. *Id.* at 632. Then, at a follow-up in June 2016, after Jacqueline had been seen by INI Neurology and obtained an EMG/NCV scan, Dr. Wargo discussed the EMG results and lab results with Jacqueline, conducted a physical exam, ordered more lab tests, ordered a follow-up appointment in 5 weeks, and noted that Jacqueline would "see Psychiatry, Neurology, and Neurosurgery prior to her next appointment." *Id.* at 606-09. As Jacqueline's primary care physician, Dr. Wargo oversaw Jacqueline's medication and overall treatment, which included the review of examinations, labs, and imaging conducted by Jacqueline's specialists. Dr. Wargo's review of the work of specialists, particularly the doctors at INI Neurology, represents the supportability of Dr. Wargo's opinion, another factor the ALJ failed to discuss. *See* 20 C.F.R. § 416.927(c)(3) ("Supportability. The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). In his physical RFC form, Dr. Wargo stated that his opinions were based in part on Jacqueline's diagnoses of subacute degeneration of the

14

spinal cord and sensory neuropathy and her follow up with Neurology. (R. 1227). At best, the ALJ's discussion of the treating physician factors was limited to her discussion of the consistency of Dr. Wargo's opinion with the record, and that analysis, as explained above, was flawed.

The ALJ was required to address the treating physician factors and explain how they impacted her decision to give little weight to Dr. Wargo's opinions. *Schreiber v. Colvin*, 519 Fed. Appx. 951, 959 (7th Cir. 2013) (citation omitted) (ALJ shall "sufficiently account[ ] for the factors in 20 C.F.R. § 404.1527"). Because the ALJ did not address these factors, the Court is unable to determine whether he properly assigned little weight to Dr. Wargo's opinions. Accordingly, a remand is necessary for the ALJ to properly analyze and explain the weight to be afforded Dr. Wargo's opinions in light of all the regulatory factors. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (remanding where the ALJ failed to "explicitly address the checklist of factors as applied to the medical opinion evidence").

**C.      The ALJ's Treating Physician Error is Not Harmless**

The ALJ's improper weighing of Dr. Wargo's opinion is not harmless error. Harmless error occurs when "it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" because remanding would be "a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). In this case, if the ALJ had not misstated the record, or if the ALJ had assessed Dr. Wargo's opinion per the regulatory factors, she might have given more weight to Dr. Wargo's opinion.

15

Giving greater weight to Dr. Wargo's opinion could have changed the outcome of the case because Dr. Wargo's RFC opinion was more restrictive than the ALJ's pre-September 2017 RFC. The ALJ concluded that Jacqueline could perform light work, yet Dr. Wargo opined that Jacqueline could stand for less than about six hours, and that she could sit for less than about six hours. (R. 1226). Such a finding would eliminate Jacqueline's ability to perform work at the light or sedentary levels. *See* SSR 83-10, at *5-6 (light work comprises standing or walking for approximately 6 hours and sedentary work comprises sitting for approximately 6 hours). Dr. Wargo also found that Jacqueline was limited in reaching, handling, fingering, feeling, and hearing, whereas the ALJ's pre-September 2017 RFC found limitations only in reaching and hearing. *Id.* at 20, 1226-27. Dr. Wargo further opined that Jacqueline could never climb, balance, stoop, kneel, crouch, or crawl, and the ALJ allowed for occasional climbing, balancing, stooping, kneeling, crouching, and crawling. *Id.* Thus, Dr. Wargo's RFC opinion provided a more limited RFC than the ALJ's pre-September 2017 RFC, and the ALJ's improper weighing of Dr. Wargo's opinion was prejudicial.

The Commissioner apparently disagrees that Dr. Wargo's RFC was more restrictive than the ALJ's by arguing that Dr. Wargo's assessment was "largely consistent with the ALJ's RFC, and was also consistent with a finding of disability as of September 20, 2017." Doc. [24] at 5. In particular, the Commissioner contends that Dr. Wargo did not assess Jacqueline's ability to stand, walk, and sit as more limited than as found by the ALJ. *Id.* at 6. For the reasons discussed above, the Court disagrees.[6] The Commissioner also argues

---

[6] The Commissioner relatedly contends that Dr. Wargo's opinion is generally consistent with light work, citing SSR 83-10. Doc. [24] at 5. However, the very policy statement referred to by the Commissioner shows why the Commissioner is wrong. SSR 83-10 states that a job in the light category "requires a good deal of walking or standing—the primary difference between sedentary

16

that the timing of Dr. Wargo's opinion, which came only a month before the ALJ's beginning disability date, makes Dr. Wargo's opinion consistent with the ALJ's RFC. *Id.* at 3, 5-6. Yet the Court does not find the date of Dr. Wargo's physical RFC assessment to mean that Jacqueline did not become disabled *until* August 2017. The Commissioner argues that Dr. Wargo did not indicate that his findings were retroactive. *Id.* While it is true that Dr. Wargo did not affirmatively state the timeframe for his findings, it is clear that the findings pertained to Jacqueline's condition leading up to the physical RFC in August 2017, as Dr. Wargo based his findings on Jacqueline's neuropathy and spinal diagnoses, Jacqueline's following up with Neurology, Dr. Wargo's conversations with Jacqueline, as well as conclusions drawn from her symptoms, all of which occurred before the August 2017 opinion. (R. 1226-27).

Put simply, the ALJ decided that Jacqueline became disabled in September 2017 due to the hospitalization that occurred then and her subsequent decline in health, whereas Dr. Wargo found she was disabled before that date, based on her neuropathy and spinal cord diagnoses. As a result, the ALJ's RFC and Dr. Wargo's opinion are inconsistent, it is not predictable with great confidence that the agency would reinstate its decision on remand had the ALJ given greater weight to Dr. Wargo's opinion, and the ALJ's error is not harmless. *See Lambert,* 896 F.3d at 776. On remand, the ALJ must properly consider

---

and most light jobs." SSR 83-10, at *5. The policy statement subsequently clarifies that light work requires approximately 6 hours of standing or walking in an 8-hour workday. *Id.* at *6. While light work can encompass "sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls," SSR 83-10 finds that "[r]elatively few unskilled light jobs are performed in a seated position." *Id.* Light work, under SSR 83-10, further encompasses occasional stooping. *Id.* Because Dr. Wargo's opinion allows for neither stooping nor six hours of standing and/or walking, his opinion is not consistent with light work.

and weigh Dr. Wargo's opinion. If the ALJ does not give controlling weight to Dr. Wargo's opinion, she must articulate her consideration of the regulatory factors.

## CONCLUSION

For these reasons, Jacqueline's motion for summary judgment [11] is granted in part and denied in part, the Commissioner's motion for summary judgment [23] is denied, and the decision of the ALJ is reversed and remanded for further proceedings consistent with this Memorandum Opinion and Order.

**SO ORDERED.**

Dated: November 20, 2020

_____
Sunil R. Harjani
United States Magistrate Judge